IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| INTERMEDIARYED,<br><br>    Plaintiff,<br><br>vs.<br><br>CINCINNATI INSURANCE COMPANY,<br><br>    Defendant. | No.  3:25-cv-00038-SHL-HCA<br><br>**ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT** |

After filing a lawsuit against a competitor in Tennessee, Plaintiff IntermediaryEd (formerly known as "ACT"[1]) sent letters to two of the competitor's customers making disparaging statements about the competitor's products. This was a bad move. The competitor brought counterclaims under the Lanham Act and for intentional interference with business relationships, and ACT ended up on the wrong end of a multimillion-dollar jury verdict.

The question here is whether ACT is entitled to defense and indemnity insurance coverage for the adverse verdict (and later settlement) pursuant to a commercial general liability policy provision that covers "personal and advertising injury" arising out of the "oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or service." For reasons explained in full below, the Court concludes that ACT is entitled to defense and indemnity coverage for both the Lanham Act and intentional interference claims. The Court therefore GRANTS IN PART ACT's Motion for Partial Summary Judgment. (ECF 41.) There is, however, an important caveat. The policy contains exclusions for "knowing violation of rights of another" and/or "material published with knowledge of falsity," and the Court cannot conclude as a matter of law whether those exclusions apply. The Court therefore also DENIES IN PART ACT's Motion for Partial Summary Judgment. The Court DENIES in full Defendant Cincinnati Insurance Company's Motion for Partial Summary Judgment. (ECF 54.)

---

[1] ACT, Inc., changed its name to "IntermediaryEd" in 2024. (ECF 41-3, p. 3.) Because the entity used the name "ACT" at most times relevant to the case, and because both parties' briefs primarily use "ACT" to refer to the entity (see, e.g., ECF 41-1, pp. 6–7; ECF 54-1, p. 4), the Court will refer to Plaintiff as "ACT" in this Order.

## I.    UNDISPUTED FACTS.

*A. Relevant Policy Provisions.*

ACT purchased the Cincinnati Insurance Company Commercial General Liability Coverage Policy (the "CGL Policy") from Cincinnati Insurance Company ("CIC"). (ECF 54-3, ¶¶ 1–2.) As relevant here, the CGL Policy states that CIC will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." (ECF 54-3, ¶ 3; ECF 62-1, ¶ 13.) The CGL Policy defines "personal and advertising injury" as "injury, including consequential 'bodily injury' arising out of one or more of the following offenses . . . d. oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (ECF 54-3, ¶ 4.) The CGL Policy defines "advertisement" to mean:

> a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. "Advertisement" includes a publicity article. For purposes of this definition:
>
> a.  Notices that are published include material placed on the Internet or on similar electronic means of communication; and
>
> b.  Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

(ECF 54-3, ¶ 5.)

The CGL Policy contains an exclusions section stating, in relevant part:

**1. Exclusions**

> This insurance does not apply to:

**a.  Knowing Violation of Rights of Another**

> "Personal and Advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b.  Material published with Knowledge of Falsity**

> "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

(ECF 62-1, ¶ 16.)

CIC also issued an Umbrella Policy to ACT. (ECF 62-1, ¶ 12.) The Umbrella Policy defines the insuring agreement as follows:

> We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies.
>
> a. Which is in excess of the "underlying insurance", or
>
> b. Which is either excluded or not insured by "underlying insurance".

(ECF 54-3, ¶ 6.) The Umbrella Policy defines "personal and advertising injury" as "injury, including 'bodily injury', arising out of one or more of the following offenses. . . . e. Defamation of character, including oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (ECF 54-3, ¶ 7.) The Umbrella Policy contains similar exclusions to the CGL Policy. (ECF 62-1, ¶ 14.) For simplicity, the remainder of this ruling will refer only to the "CGL Policy"—or, sometimes, simply the "Policy"—when describing the scope of coverage, with the understanding that the reference is intended to cover the Umbrella Policy, too.

### B. ACT's Litigation Against Worldwide Interactive Network, Inc.

ACT and a competitor, Worldwide Interactive Network, Inc. ("WIN"), both sell employment skills testing to public and private employers. (ECF 62-1, ¶ 2.) On May 14, 2018, ACT sued WIN in the United States District Court for the Eastern District of Tennessee for copyright infringement, unfair competition, false advertising, breach of contract, and antitrust violations. (ECF 54-3, ¶¶ 8, 17; ECF 62-1, ¶ 2.) On June 26, 2018, ACT sent a letter to one of WIN's South Carolina-based customers, KC Associates, LLC, with the following statements: (a) ACT's WorkKeys system will not work with other assessments, as it was intended to work with WorkKeys; (b) the job profiles created for ACT's WorkKeys do not work interchangeably with the assessments provided by WIN; (c) WIN does not have a component that matches job profiling; and (d) WIN claims that its WIN assessments for the workplace "align" with ACT's WorkKeys assessments, but this claim is unsubstantiated and ACT believes it to be false. (ECF 54-3, ¶ 9; ECF 41-3, p. 347.) On June 27, 2018, ACT sent a letter to a second South Carolina-based customer, ORA Business Services Consultant, with similar statements. (ECF 54-3, ¶ 10; ECF 41-3, p. 348.) These two letters will be referred to as the "South Carolina Letters."

The South Carolina Letters prompted WIN to file counterclaims against ACT for false advertising, intentional interference with business relationships, and declaratory judgment. (ECF

3

54-3, ¶ 11.) Win alleged that the South Carolina Letters were false, misleading, and misrepresented WIN's goods, services, or commercial activities. (ECF 54-3, ¶ 12.) ACT and WIN filed cross motions for summary judgment. (ECF 54-3, ¶ 17.) Chief Judge Travis R. McDonough, of the United States District Court for the Eastern District of Tennessee, denied ACT's motion for summary judgment in a ruling that made clear that the false statements in the South Carolina Letters served as the factual predicate for WIN's intentional interference counterclaim:

> The Court need not determine whether the competitor's privilege prevents WIN from claiming improper motive, because, 'even if a competitor enjoys a privilege that negates the improper motive requirement, it is not insulated from liability if the other requirement is present, i.e., improper means." *Watson's Carpet*, 247 S.W.3d at 184 – 85 ("The competitor's privilege does not apply to prevent liability based on wrongful means, methods, or conduct."). WIN argues that ACT did employ improper means by 'making false statements about WIN and WIN's business." (Doc. 215, at 43.) ACT argues that WIN has not shown improper means, because it has not shown that the statements in the letters were false.
>
> As the Court has already explained, the evidence offered by WIN—specifically Ms. Palmer's testimony that ACT knew of the white paper suggesting alignment and did not independently review the assessments before mailing the letters—creates a genuine dispute as to the falsity of ACT's statements. (See Doc. 215-1, at 30–35.) Dissemination of false statements would constitute improper means of interfering with business relationships, as such conduct is independently tortious. See *Trau-Med*, 71 S.W.3d at 701 n.5; *Real Stone Veneers of Tenn., LLC v. Real Stone of Am., LLC*, No. 1:19-cv-33, 2019 WL 3797332, at *6 (E.D. Tenn. Aug. 12, 2019) (finding that a violation of Lanham Act qualifies as an improper means). Accordingly, the factual question as to falsity of the statements precludes summary judgment in ACT's favor on this basis.

(ECF 54-3, ¶ 17 (quoting *ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-cv-186, 2020 WL 12574239, at *37 (E.D. Tenn. Mar. 10, 2020).) In 2022, the case went to trial. The Agreed Final Pretrial Order listed the following theory of recovery on WIN's counterclaims:

> WIN will show that it is entitled to damages from ACT for false advertising and intentional interference with business relationships. After WIN won the South Carolina contract in 2018, ACT sent letters and other communications to South Carolina and others with whom WIN had business relationships, making false assertions and threats. WIN will show that ACT did so with the intention of interfering with WIN's relationship with South Carolina and others. WIN will show that it is entitled to damages caused by these false and threatening communications.

(ECF 54-3, ¶ 18.)

4

During opening statements, WIN's attorney said: "We will present evidence that these letters contain false statements, thus constituting false advertising, that they were intentionally sent in an effort to interfere with the contracts, and that WIN is entitled to damages." (ECF 62-1, ¶ 5.) At trial, WIN presented, among other things, the following evidence regarding false statements in the South Carolina Letters: (a) testimony from Teresa Chasteen that ACT and WIN measure the same skills and levels as the original WorkKeys; (b) testimony from Chasteen that WIN assessments align with the ACT WorkKeys assessments; and (c) testimony from Amy Burkam that ACT's and WIN's tests address the same set of standards and are aligned. (ECF 54-3, ¶ 19.) WIN also presented evidence that its own statements were not false, including testimony from Chasteen regarding the validity, quality, and reliability of WIN's assessments, as well as testimony regarding the alignment between WIN's assessments and WorkKeys. (Id., ¶ 20.) Chasteen further testified that the South Carolina Letters created "negative information out to the employers. And we were not able to meet the numbers in our contract for that reason." (Id., ¶¶ 21–22.) In other words, she testified that WIN lost revenue due to the South Carolina Letters. (Id.) During closing argument, WIN's attorney argued that there was evidence of:

> letters written to these job profilers…employers, hiring offices, and the motive was to try to harm WIN. No question about it. They had false statements in there. The false statements were that WIN's assessments couldn't be used with the WorkKeys profile and that WIN's claim of alignment was false. Those are false statements. That constitutes false advertising, and it also constitutes intentional interference with business relations.

(Id., ¶ 23.)

The jury instructions defined the elements of WIN's Lanham Act counterclaim to include: (1) false or misleading statements by [ACT] concerning its own product or [WIN's] product, (2) the statement actually deceives or has the tendency to deceive a substantial portion of the intended audience, (3) materiality, (4) interstate nexus, and (5) damages. (Id., ¶ 24.) In discussing the concept of a "false statement of fact," Chief Judge McDonough explained that WIN had to prove that ACT "made, in advertisements or promotions, false statements of fact, or that one defendant directed another defendant to make such statements, that are either (1) literally false, or (2) likely to mislead consumers." (Id., ¶ 25.) The instructions said "commercial advertising" can "extend beyond the classic advertising campaign into other forms of promotion used to influence consumers to purchase goods or services. A false or misleading statement does not have to be in a

typical advertisement to constitute commercial advertising or promotion under the Lanham Act." (Id., ¶ 28.) The instructions said the jury had to find that statements were made in "commercial advertising or promotion" for the first element of the Lanham Act claim to be satisfied. (Id., ¶ 29.[2])

The jury instructions defined the elements of a claim for intentional interference with business relationships as requiring proof that ACT used "improper means" to cause a breach or termination of WIN's relationships or prospective relationships. (Id., ¶ 26.) The instructions defined "improper means" to include "conduct such as violation of statutes, regulations, or laws. Violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation, or deceit, defamation, duress, undue influence, misuse of insider confidential information, or breach of its fiduciary relationship." (Id., ¶ 27.) The instructions deviated from the Tennessee model jury instruction as it relates to the definition and scope of "improper means." (ECF 66, ¶ 51.)

The jury instructions also explained that WIN sought punitive damages on the intentional interference with business relationships claim. (ECF 66, ¶ 52.) It said that punitive damages "are reserved for egregious conduct" and should be awarded only if WIN "has shown by clear and convincing evidence that the defending party has acted intentionally, recklessly, maliciously, or fraudulently." (Id.)

At trial, WIN's theory was that the South Carolina Letters violated the Lanham Act and constituted intentional interference with business relationships. (ECF 54-3, ¶ 29.) On September 9, 2022, the jury returned a verdict in favor of WIN and against ACT in the amount of $218,000 for false advertising under the Lanham Act and $5,400,000 for intentional interference with business relationships. (Id., ¶ 30.) The jury also found that punitive damages should be awarded against ACT. (Id.) The verdict form for the award of punitive damages stated: "Do you find by clear and convincing evidence that WIN is entitled to punitive damages?" (See ECF 720, *ACT, Inc. v. Worldwide Interactive Network, et al.*, Case No. 3:18-cv-186 (E.D. Tenn. Sept. 9, 2022).)[3]

---

[2] CIC's Response to IntermediaryEd's Statement of Material Facts inadvertently included two paragraphs numbered "29." (ECF 54-3, pp. 11–12.) The first "Paragraph 29" in CIC's Response was actually the second paragraph of IntermediaryEd's Paragraph 28. (Id.) The second "Paragraph 29" in CIC's response correctly corresponds with IntermediaryEd's Paragraph 29. (Id.)

[3] The parties inadvertently failed to submit the punitive damage verdict form, but the Court was able to locate it on the electronic case filing system for the United States District Court for the Eastern District of Tennessee. The Court takes judicial notice of this record, as well as the corresponding instruction on punitive damages. *See Conforti v. United States*, 74 F.3d 838, 840 (8th Cir. 1996) ("[F]ederal courts may *sua sponte* take judicial notice of proceedings in other courts if they relate directly to the matters at issue." (citation omitted)).

The jury put a checkmark on the line next to "Yes." (Id.) The verdict on punitive damages arose out of the following jury instruction:

> WIN has asked that you make an award of punitive damages in connection with its claim for intentional interference with business relationships, but this award may be made only under the following circumstances: The purpose of punitive damages is not to further compensate the claiming party but to punish a wrongdoer and deter others from committing similar wrongs in the future. Punitive damages are reserved for egregious conduct. Punitive damages may be considered if, and only if, the claiming party has shown by clear and convincing evidence that the defending party has acted intentionally, recklessly, maliciously, or fraudulently. Clear and convincing evidence is a different and higher standard than preponderance of the evidence. It means that the defending party's wrong, if any, must be so clearly shown that there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.
>
> A person acts intentionally when it is the person's purpose or desire to do a wrongful act or to cause the result. A person acts recklessly when the person is aware of but consciously disregards a substantial and unjustifiable risk of injury or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under all the circumstances. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts -- acts fraudulently when (1) the person's -- the person intentionally either misrepresents an existing material fact or causes a false impression of an existing material fact to mislead or to obtain an unfair or undue advantage, and (2) another person suffers injury or loss because of reasonable reliance upon that representation. If you decide to award punitive damages, you will not assess an amount of punitive damages at this time. You will, however, report your finding to the Court.

(*See* ECF 746, pp. 13–14, *ACT, Inc. v. Worldwide Interactive Network, et al.*, Case No. 3:18-cv-186 (E.D. Tenn. Nov. 8, 2022).)

Trial was bifurcated, and thus the jury did not determine the amount of punitive damages when it made the finding to award them. Before the parties went forward with the second (punitive damages) phase of trial, ACT engaged in settlement negotiations with WIN. Mike Frey, an attorney for CIC, asked Emily Scott to "forward the terms of any offers to me as well. There are both coverage and defense sides for this case set up by [CIC]." (ECF 54-3, ¶ 31.) Later that day, Frey told Scott that CIC's decisionmakers were not immediately available and "ACT should make whatever decisions it believes to be in the best interests of ACT [during settlement negotiations]. Cincinnati will provide its position on potential indemnity coverage for the adverse verdict as soon as practical." (Id., ¶ 32.) On September 12, 2022, ACT ended up reaching an out-of-court

7

settlement with WIN ▮▮▮▮▮▮▮, and thus the jury never rendered a verdict on the amount of punitive damages to award. (ECF 54-3, ¶ 33; ECF 54-5, p. 60.)

C. *Correspondence Between CIC and ACT Regarding Coverage.*

At some point after the filing of WIN's counterclaims in July 2018, ACT tendered the matter to CIC for coverage. (ECF 54-3, ¶ 13.) On September 17, 2019, Holly Carlson (who is apparently affiliated with CIC) sent an email to Timothy Conlon, in-house counsel for ACT, stating: "If it is determined that we have a duty to defend, we will reimburse past expenses relating to the counterclaim." (ECF 66, ¶ 53.) On October 10, 2019, CIC agreed to provide ACT with a defense to the counterclaims but reserved the right to deny indemnity. (ECF 54-3, ¶ 14.) In its reservation of rights letter, CIC said, "[t]here could possibly be some indemnity insurance coverage for the false advertising claim under the Lanham Act." (ECF 54-3, ¶ 16.) The reservation of rights letter further stated, in part: "The false advertising claim in WIN's counter-claim may constitute slander, libel or disparagement under 17d of the personal and advertising injury definition, set out above." (ECF 66, ¶ 49.) The letter acknowledged that the false advertising claim "may trigger a duty to defend under 17(d)." (Id.) CIC agreed to Sheppard Mullin as defense counsel. (ECF 54-3, ¶ 15.)

In correspondence from Michael J. Frey dated January 31, 2020, CIC proposed to cover legal costs "for the defense of the WIN counterclaim." (ECF 62-1, ¶ 15.) On February 11, 2020, Conlon (ACT's in-house counsel) sent an email to Frey stating: "Mike, As discussed, ACT accepts the proposal as outlined in your letter." (Id., ¶ 16; ECF 54-4, p. 101.) The parties dispute whether this correspondence created an enforceable agreement. (ECF 62-1, ¶¶ 15–16.)

As litigation went on, CIC expressed concerns about not receiving invoices that delineated fees associated with ACT's affirmative claims from those associated with defending WIN's counterclaims. (ECF 62-1, ¶¶ 18–19.) On September 22, 2020, Jennifer Smith, who is apparently affiliated with ACT, wrote to Frey to explain that due to the overlap in the respective claims of ACT and WIN, "work performed on the counter-claims relates directly to both the claims and counter-claims, although defending the counter-claims has required additional work by Sheppard Mullin. In most instances time entries cannot be separated between work benefitting the counterclaims and work benefitting the claims." (ECF 54-3, ¶ 34.) On July 13, 2022, Lisa Weixelman, who is also apparently affiliated with ACT, reiterated the overlap between the claims and counterclaims, stating: "Thus, work performed on the counterclaim relates directly to both the

claim and counterclaim. In most instances time entries cannot be separated between the counterclaim and the claim because the work benefits both claims." (Id., ¶ 35.) Weixelman also said that CIC "has acknowledged its obligation to defend ACT in the WIN litigation. In order to fulfill that duty, CIC must fully pay for ACT's defense expenses at the rates agreed to by ACT and CIC; this includes payment of expenses that also benefit ACT's affirmative claims and/or expenses where it is impossible to allocate a task between work related to the claim and the counterclaim." (Id., ¶ 36.)

In total, CIC has paid ████████ for the defense of WIN's counterclaims. (ECF 62-1, ¶ 22.) This is a relatively small portion of the total amount billed by Sheppard Mullin to ACT for fees (████████) and disbursements (████████). (ECF 66, ¶ 54.)

*D. Additional Facts Proffered by ACT Regarding the South Carolina Letters.*

As part of its Response to CIC's Motion for Summary Judgment, ACT proffered the following additional facts regarding the period leading up to ACT sending the South Carolina Letters in late June 2018. On June 5, 2018, Conlon (ACT's in-house counsel) sent an email to Laura Chapman asking for her thoughts on ████████ ████████ ████████ ████████ ████████ (Id., ¶ 38.) Chapman responded to say it was a ████████ and she ████████ ████████ (Id., ¶ 39.) Conlon brought Thomas Langenfeld and Helen Palmer, whom ACT identifies as "subject matter experts," into the discussion with Chapman. (Id., ¶ 40.) Conlon wrote: ████████ ████████ ████████ (Id.) Palmer said, ████████ ████████ ████████ (Id.)

At some point, a draft letter was apparently prepared. On June 11, 2018, Chapman sent an email saying that ████████ ████████ (Id., ¶ 41.) The same day, ████████ ████████

9

██████████████ (Id., ¶ 42.) A few days later, on June 15, Conlon sent an email ████████

████████████████████████████████████████████████████████

████████ (Id., ¶ 43.)

At trial in Tennessee, Palmer testified that: (i) ACT knew that WorkKeys profiles would not work interchangeably with WIN's assessments; (ii) ACT checked WIN's website and determined that WIN did not have a component that matched ACT's job profiling component; and (iii) ACT requested documentation from WIN to substantiate its claim that its assessments "align" with WorkKeys, but none was furnished. (Id., ¶ 47.) ACT retained an expert, Dr. Stephen Sireci, who testified that: (i) ACT's WorkKeys assessments did not align with and were not comparable to WIN's assessments; (ii) WIN knew its claim of alignment and compatibility was false when WIN asserted those views in December 2017; and (iii) WIN's use of a copy of ACT's products to develop WIN's product did not make them aligned and comparable. (Id., ¶ 48.)

## II.    Legal Standards.

### A.  Summary Judgment Standard.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (S.D. Iowa 2019).

### B.  Insurance Coverage Disputes Under Iowa Law.

Under Iowa law, "[t]he cardinal principle in the construction and interpretation of insurance policies is that the intent of the parties at the time the policy was sold must control." *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998). "Except in cases of ambiguity, the intent of the parties is determined by the language of the policy." *Id.* "Policy interpretation—the process of attaching meaning to the words used—is a task reserved to the court unless it involves extrinsic evidence or choices to be drawn from reasonable inferences." *Plymouth Farmers Mut. Ins. Ass'n v. Armour*, 584 N.W.2d 289, 292 (Iowa 1998). "An ambiguity exists when, after application of our

relevant rules of interpretation, a genuine uncertainty results as to which of two or more meanings is proper." *Am. Fam. Mut. Ins. Co. v. Petersen*, 679 N.W.2d 571, 576 (Iowa 2004). "When two reasonable interpretations exist, the policy is construed most favorably to the insured." *Id.*

The insured—here, ACT—bears the initial burden of proving that its claim falls within the policy's coverage. *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 549 (Iowa 2022). But "[i]nsurers relying on exclusions from coverage have the burden to prove their applicability." *Farm Bureau Life Ins. Co. v. Chubb Custom Ins. Co.*, 780 N.W.2d 735, 742 (Iowa 2010). "Exclusions from coverage are construed strictly against the insurer." *Prudential Ins. Co. of. Am. v. Martinson*, 589 N.W.2d 64, 65 (Iowa 1999).

## III.    LEGAL ANALYSIS.

ACT moves for partial summary judgment, arguing that there is no dispute of material fact regarding CIC's obligation to indemnify ACT pursuant to the CGL Policy provision requiring CIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." ACT argues that the jury verdicts on the Lanham Act and intentional interference claims award damages for "personal and advertising injury" as defined in the Policy. CIC cross-moves for summary judgment, arguing that the jury verdicts were not for "slander," "defamation," or "disparagement" and thus are not covered. Alternatively, CIC argues that coverage is defeated under Policy exclusions for "Knowing Violation of Rights of Another" and "Material Published with Knowledge of Falsity."

### A.    The Court Must Consider More than Formalistic Labels in Determining Whether CIC Has a Duty to Indemnify.

One of the threshold questions is what evidence the Court should consider in evaluating the parties' respective positions. Broadly speaking, the parties agree that the Court must examine the jury verdicts in the underlying litigation. *See, e.g.*, *N. Iowa State Bank v. Allied Mut. Ins. Co.*, 471 N.W.2d 824, 826 (Iowa 1991) ("Resolution of this issue requires an examination of the terms of the policy and the character of the judgment."). The parties diverge, however, on what this examination should entail. CIC views the matter formalistically: if WIN did not recover on theories of slander, defamation or disparagement, then coverage must be denied, period. By contrast, ACT argues that the Court must examine the "operative facts."

Both sides find some level of support for their positions under Iowa law. In *North Iowa State Bank v. Allied Mutual Insurance Company*, the Iowa Supreme Court essentially took a

formalistic approach that focused solely on the successful and unsuccessful theories of recovery in the underlying case. 471 N.W.2d at 828. Because the only judgment rendered against the insured was on a theory for which no coverage existed, *North Iowa State Bank* held there was no duty to indemnify. *Id.* CIC relies heavily on *North Iowa State Bank* here.

ACT focuses on *Employees Mutual Casualty Company v. Cedar Rapids Television Company*, which held that "it is clear under Iowa law that an insurance company is to look at the *allegations of fact* in the third-party plaintiff's petition against the insured and *not* the legal theories on which the third-party claims insured is liable." 552 N.W.2d 639, 642 (Iowa 1996). *Cedar Rapids Television* distinguished *North Iowa State Bank* because it "arose from a complicated procedural morass stemming from a judgment entered against the insured, plaintiff bank. The bank's claim in *North Iowa State Bank* seeking reimbursement from its insurer for this judgment amounted to a collateral attack upon an unappealed judgment of the district court in a prior declaratory judgment action." *Id.* at 642 n.2. *Cedar Rapids Television* noted that *North Iowa State Bank* "never addressed" whether coverage would exist when liability is founded on a different legal theory than the one in the policy but that involves "identical conduct" by the insured to what would be covered. *Id.*

In *Talen v. Employers Mutual Casualty Company*, the Iowa Supreme Court clarified that there is no per se rule requiring courts to focus on legal theories or operative facts. 703 N.W.2d 395, 402 (Iowa 2005). Instead, "[i]nsurance coverage is a contractual matter and is ultimately based on policy provisions. Insurers may and frequently do extend liability coverage to only specific torts." *Id.* (internal citation omitted). Thus, if the CGL Policy limits coverage to specific torts, then formalistic labels are all that matter; otherwise, the underlying facts must be considered. To the extent *Cedar Rapids Television* held otherwise, *Talen* "cho[]se not to extend the holding of *Cedar Rapids Television* beyond the facts of that case." *Id.* at 403.

The Court does not interpret the CGL Policy as limiting coverage to the specific torts of slander, libel, and disparagement. The relevant Policy language is simply too broad. By covering injuries for "personal and advertising injury" that arise out of the "oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," the CGL Policy includes coverage for tort claims that arise out of false and disparaging statements about a competitor's goods, products, or services, regardless of the label attached to those claims. *See St. Paul Fire & Marine Ins. Co. v. Med. X-Ray*

*Ctr.*, 146 F.3d 593, 594–95 (8th Cir. 1998) (holding that insurer had duty to defend intentional interference claims that arose out of allegedly false statements that disparaged competitor's business); *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1177–78 (D. Kan. 2012) (similar). In other words, the policy covers "causes of action for product disparagement or one that is analogous." *Mass. Bay Ins. Co. v. Walflor Indus., Inc.*, 383 F. Supp. 3d 1148, 1159 (W.D. Wash. 2019).

The Court reaches this conclusion in part because courts use a wide range of terminology to describe commercial tort claims arising out of the "oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *See, e.g.*, *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1138 n.6 (3d Cir. 1977). In some jurisdictions, these claims are known as "disparagement," "product disparagement," "trade libel," or "slander of goods." *Id.* In others, the claims are for "injurious falsehood," *Neurotron Inc. v. Med. Serv. Ass'n of Pa., Inc.*, 254 F.3d 444, 448 (3d Cir. 2001), "product defamation," *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 521 (N.Y. 1981), "commercial disparagement," *id.* at 522, or "trade defamation," *Jurlique, Inc. v. Austral Biolab Pty., Ltd.*, 590 N.Y.S.2d 235, 236 (N.Y. App. Div. 1992). *See also, e.g.*, *Next Techs. Inc. v. Beyond the Off. Door, LLC*, 992 F.3d 589, 592 (7th Cir. 2021) ("product defamation" or "trade libel"). Regardless of the terminology, the gist of these claims is the same: "a party publishes material derogatory to another's business, intending to prevent others from dealing with plaintiff." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 919 F. Supp. 756, 761 (D.N.J. 1996). By including the words "slander[]," "libel[]," and "disparage[ment]" as part of coverage for "advertising injury" relating to a company's "goods, products or services," the CGL Policy is properly understood as sweeping all of these torts into the scope of the coverage, regardless of the exact terminology used in the underlying litigation. For simplicity, the remainder of this ruling will refer to these torts as "trade libel or commercial disparagement."

In some circumstances, an intentional interference with business relationships claim will fall within the scope of coverage for "personal and advertising injury" in a policy like the one at issue here. This is because one of the elements in an intentional interference claim is that the defendant used "improper means" to interfere with the plaintiff's relationship(s). The plaintiff can establish this element by, among other things, proving the defendant made false statements that disparaged the plaintiff's goods, products, or services. Which is to say, the plaintiff can prove

improper means in the form of trade libel or commercial disparagement. In fact, as one court has explained, "[t]rade libel and product defamation" are "born of the cause of action for unlawful interference." *Coll. Sav. Bank*, 919 F. Supp. at 762. Accordingly, courts have held that coverage exists under similar or identical policy provisions when an intentional interference claim is predicated on trade libel or commercial disparagement. *See, e.g.*, *St. Paul Fire & Marine Ins. Co.*, 146 F.3d at 594–95; *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 744–45 (7th Cir. 2001); *Bankwest v. Fidelity & Deposit Co. of Md.*, 63 F.3d 974, 980 (10th Cir. 1995); *Home Ins. Co. v. Waycrosse, Inc.*, 990 F. Supp. 720, 729–30 (D. Minn. 1996), *aff'd*, 131 F.3d 143 (8th Cir. 1997). The Court interprets *Talen*, *Cedar Rapids Television*, and *North Iowa State Bank* as being consistent with these cases and thus requiring careful analysis of the record in the underlying litigation to determine if the intentional interference claim here was predicated on trade libel or commercial disparagement. If so, CIC has a duty to indemnify.

Similarly, claims under the Lanham Act sometimes revolve around trade libel or commercial disparagement in the form of false advertising regarding a third party's goods, products, or services. *See* 15 U.S.C. § 1125(a). Many courts even characterize such claims as "product disparagement under the Lanham Act" or similar verbiage. *See Podiatrist Ass'n, Inc. v. La Cruz Azul De P.R., Inc.*, 332 F.3d 6, 19 (1st Cir. 2003) (summarizing the "Lanham Act's commercial disparagement provision"); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) ("product disparagement under the Lanham Act"); *Kole v. Village of Norridge*, 941 F. Supp. 2d 933, 958 (N.D. Ill. 2013) ("In Count IX, Plaintiffs allege commercial disparagement under Section 43(a) of the Lanham Act . . . ."); *Pro. Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 727 (S.D.N.Y. 2004) (stating the elements for a "product disparagement case under the Lanham Act"); *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1530 (S.D.N.Y. 1994) ("Under the 1988 amendments to Section 43(a) [of the Lanham Act], trade libel and product disparagement claims became actionable."). It follows that Lanham Act claims can, in appropriate circumstances, also give rise to insurance coverage under policies that cover trade libel or commercial disparagement. *See Hanover Ins. Co. v. Anova Food, LLC*, 173 F. Supp. 3d 1008, 1021–22 (D. Haw. 2016) (holding that insurer had duty to defend Lanham Act claims for false advertising); *JAR Lab'ys LLC v. Great Am. E & S Ins. Co.*, 945 F. Supp. 2d 937, 944–45 (N.D. Ill. 2013) (similar). The Court therefore again needs to look closely at the record in the underlying litigation to determine if the Lanham Act claim was predicated on those torts.

14

In concluding that the analysis must go beyond mere labels, the Court is aware that many of the cases on which ACT relies to establish coverage involved the duty to defend, not the duty to indemnify. As CIC correctly points out, the duty to defend is broader than the duty to indemnify. *See, e.g.*, *Stine Seed Farm, Inc. v. Farm Bureau Mut. Ins. Co.*, 591 N.W.2d 17, 18 (Iowa 1999). Even so, duty-to-defend cases are useful because they revolve around the proper interpretation of the relevant policy language, which is the crucial issue under Iowa law for the duty to defend and duty to indemnify alike. In the Iowa Supreme Court's words, "[t]he two duties are clearly coextensive; Iowa law is well-settled that there is no duty to defend unless there is a duty to indemnify." *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995); *see also Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 737 F. Supp. 1320, 1330 (S.D.N.Y. 1990) ("[T]he duty to defend and the duty to indemnify are related, and where the duty to defend arises, the duty to indemnify often follows."). When, as here, the policy language anticipates some level of analysis beyond formalistic labels, the Court must give effect to that language when analyzing the duty to defend and duty to indemnify alike. *See Talen*, 703 N.W.2d at 402.

B. *ACT Has Established as a Matter of Law the Existence of Indemnity Coverage for the Intentional Interference and Lanham Act Claims, Subject to Policy Exclusions.*

The next question is whether ACT has established as a matter of law that the jury verdicts in the Eastern District of Tennessee on the intentional interference and Lanham Act claims were predicated on trade libel or commercial disparagement. For reasons explained below, the Court concludes that ACT has met its burden of proof on this issue and is entitled to indemnity coverage as a matter of law, subject to Policy exclusions. To the extent it is a disputed issue, the Court further concludes that CIC had a duty to defend WIN's counterclaims in the underlying litigation.

1. The Fact that WIN Did Not Attempt to Prove Reputational Injury Does Not Mean There Is No Coverage Under the CGL Policy.

As a threshold matter, CIC argues that coverage does not exist because WIN only proved pecuniary losses in the underlying litigation, not "reputational harm." (ECF 65, pp. 6–7.) CIC rests this argument on *Ottumwa Housing Authority v. State Farm Fire & Casualty Company*, 495 N.W.2d 723, 728 (Iowa 1993), which CIC interprets to mean that coverage does not exist for personal and advertising injury unless the plaintiff in the underlying litigation characterizes its injuries as "reputational." (ECF 65, pp. 6–7.)

CIC is overreading *Ottumwa Housing Authority*. There, the Iowa Supreme Court interpreted a policy that provided coverage for the "publication or utterance of a libel or slander or

15

of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right to privacy." *Id.* at 727. Because the policy did not define "disparaging," *Ottumwa Housing Authority* looked to the dictionary to determine the scope of coverage, noting that "'[d]isparage' means, among other things, 'to lower in esteem or reputation,' '[to] lower in rank by action or words,' 'to speak slightingly of,' or to 'run down.'" *Id.* at 728 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 653 (P. Gove ed. 1965)). With these definitions in mind, *Ottumwa Housing Authority* interpreted "disparaging" to require proof of injury to reputation. *Id.* Because the plaintiffs in the underlying litigation brought only sex discrimination claims and did not "seek damages for injury to [their] reputations," *Ottumwa Housing Authority* held that coverage did not exist. *Id.* CIC argues that the same conclusion is appropriate here because WIN did not use the word "reputation" to describe its injuries on the intentional interference and Lanham Act claims. Instead, it focused on pecuniary losses like lost sales.

The premise of CIC's argument is that pecuniary losses are not a form of reputational injury. In the commercial context, the premise is wrong. Indeed, there is arguably no better way for a business to show that its products have become "lower in esteem or reputation" or "lower in rank" than to prove that customers stopped buying them. *Id.* For this reason alone, the Court rejects CIC's argument. WIN did not have to use the word "reputation" to prove what are, in essence, reputational damages in the commercial sense. Nothing in *Ottumwa Housing Authority* compels otherwise.

It is, in any event, important to recognize that the policy language here is different than the language at issue in *Ottumwa Housing Authority*. There, coverage existed only for "personal injury" and merely covered the "publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy." *Id.* at 727. In other words, the policy language focused entirely on invasion-of-privacy and defamation-type torts in the *personal* sense. Here, by contrast, the CGL Policy unambiguously includes coverage for libel and disparagement in the *commercial* sense. For example, the Policy uses the words "personal *and advertising* injury" (emphasis added) to describe the scope of the coverage and defines "advertisement" to mean "a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters" (emphasis added). The words "goods, products or services" are then repeated in the definition of "personal and advertising injury." By repeatedly

16

using words like "advertising" and "goods, products or services," the clear intent of the CGL Policy is to provide coverage for commercial injuries.

Against that backdrop, there is an important difference between personal defamation claims and commercial disparagement claims. *See HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 761 (Mass. 2013). "A defamation action, which encompasses libel and slander, affords a remedy for damage to the reputation of the injured party." *Id.*; *accord Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021) ("Generally speaking, defamation is the publication of false statements of fact which tend to harm an individual's reputation."). "By comparison, an action for commercial disparagement affords a remedy for harm to the economic interests of the injured party that result in pecuniary loss." *Kiel*, 984 N.E.2d at 762. Thus, when evaluating a policy like the one at issue in *Ottumwa Housing Authority*, which provides coverage solely for defamation-type torts in the personal sense, it makes sense to focus on whether the plaintiff in the underlying case established personal, reputational injury. Here, by contrast, WIN did not have to prove reputational injury in the personal sense; instead, it had to prove pecuniary harm in the commercial sense. *See, e.g.*, *Mallory v. S & S Publ'rs*, 168 F. Supp. 3d 760, 775 (E.D. Pa. 2016) (dismissing commercial disparagement claim because plaintiff pled only damage to reputation); *Synygy, Inc. v. ZS Assocs., Inc.*, 110 F. Supp. 3d 602, 619 (E.D. Pa. 2015) (granting summary judgment for defendant on commercial disparagement claim where plaintiff failed to establish pecuniary loss). Thus, again, the fact that WIN did not use the word "reputation" to describe its injuries does not mean coverage does not exist. Instead, because the CGL Policy provides coverage for "advertising injury" based on disparagement of "goods, products or services," coverage applies when the injured party proves pecuniary damages. *See Talen*, 703 N.W.2d at 402 (holding that the analysis must focus on the policy language).

For these reasons, the Court rejects CIC's argument that *Ottumwa Housing Authority* defeats coverage as a matter of law based on WIN's failure to describe its injuries as "reputational."

   2.   <u>The Undisputed Facts Show That WIN's Intentional Interference and Lanham Act Claims Were Predicated on Trade Libel or Commercial Disparagement.</u>

With CIC's threshold argument out of the way, the Court must dig into the record in the underlying litigation to evaluate whether the verdict emanated from trade libel or commercial disparagement. As it relates to WIN's Lanham Act claim, the analysis is straightforward. The record shows that the only Lanham Act theory submitted to the jury was for false advertising under

Section 43(a) based on the false and disparaging statements in the South Carolina Letters about WIN's products. In other words, WIN's theory was based on what courts call "product disparagement under the Lanham Act." *Procter & Gamble Co.*, 242 F.3d at 565; *see also Podiatrist Ass'n, Inc.*, 332 F.3d at 19 ("Lanham Act's commercial disparagement provision"); *Kole*, 941 F. Supp. 2d at 958 ("commercial disparagement under Section 43(a) of the Lanham Act"); *Guzzi*, 349 F. Supp. 2d at 727 ("product disparagement case under the Lanham Act"). This is clearly the kind of trade libel or commercial disparagement that is included in the CGL Policy provision covering injuries arising out of the "oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Accordingly, absent an applicable exclusion, ACT is entitled to indemnity coverage for the jury verdict on the Lanham Act claim (or, more precisely, for the portion of the settlement attributable to the Lanham Act claim). *See Hanover Ins. Co.*, 173 F. Supp. 3d at 1021–22; *JAR Lab'ys LLC*, 945 F. Supp. 2d at 944–45.

The analysis is more complicated on the intentional interference claim. The instructions informed the jury that it could only return a verdict for WIN if it found that ACT used "improper means" to a cause a breach or termination of WIN's business relationships. The instructions defined "improper means" to include "conduct such as violation of statutes, regulations, or laws. Violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation, or deceit, defamation, duress, undue influence, misuse of insider confidential information, or breach of its fiduciary relationship." Some of these types of "improper means" would not give rise to coverage, such as "violence," "bribery," or "misuse of insider confidential information," to name a few.

Nonetheless, the undisputed facts show that WIN's intentional interference claim revolved entirely around the false statements in the South Carolina Letters about WIN's products. (ECF 41-3, p. 173, ¶ 184.) For example, in his ruling denying ACT's motion for summary judgment, Chief Judge McDonough identified the false statements in the South Carolina Letters as the only "improper means" offered by WIN. *ACT, Inc. v. Worldwide Interactive Network, et al.*, 2020 WL 12574239, at *37. The portions of the trial record submitted by the parties likewise show that WIN's intentional interference claim revolved entirely around those false statements. It is therefore clear that the false statements served as the predicate for the jury verdict on the intentional interference claim.

Because the jury separately concluded that the false statements violated the Lanham Act, it is equally clear that the jury found ACT to have engaged in "improper means" in the form of

"violation of [a] statute[]." Accordingly—and keeping in mind that the Lanham Act claim is predicated on tortious conduct covered by the Policy—ACT is entitled as a matter of law to indemnity coverage for at least the portion of the intentional interference claim attributable to the Lanham Act violations. *See E. Atl. Ins. Co.*, 260 F.3d at 744–45 (holding that coverage would exist for tortious interference claims predicated on commercial disparagement); *St. Paul Fire & Marine Ins. Co.*, 146 F.3d at 594–95 (similar). CIC argues, however, that the intentional interference claim must have been premised at least in part on something other than the Lanham Act violations because the jury awarded $5.4 million on the intentional interference claim but only $218,000 on the Lanham Act.

Even if CIC's premise is correct, the Court concludes that ACT has established as a matter of law that it is entitled to indemnity coverage (subject to applicable exclusions) for the entire portion of the settlement attributable to the intentional interference claim. Other than "violation of [a] statute," the only other "improper means" identified in the intentional interference instruction that the false statements conceivably might have implicated are "fraud," "misrepresentation," "deceit," and/or "defamation." In context, the undisputed facts show that all of these predicates are the functional equivalent of trade libel or commercial disparagement.

The simplest example is "defamation," which is of course covered under the CGL Policy given that the relevant coverage provision specifically includes "slander[]" and "libel[]." *See E. Atl. Ins. Co.*, 260 F.3d at 744–45; *see also Ruder & Finn Inc.*, 422 N.E.2d at 523 (recognizing that "defamation" and "disparagement" are synonymous for purposes of coverage under similar policy). The intentional interference verdict also triggers indemnity coverage to the extent it was predicated on "fraud," "misrepresentation" or "deceit" because, again, the only "fraud," "misrepresentation," or "deceit" presented in the underlying litigation consisted of the false statements in the South Carolina Letters about WIN's products. Regardless of the label, these statements amount to commercial disparagement of the type for which indemnity coverage exists. *See E. Atl. Ins. Co.*, 260 F.3d at 744–45.

The Tenth Circuit's decision in *Bankwest* is particularly persuasive. There, the insured-bank sent "letters of estoppel" to other banks in Colorado asserting that those banks were estopped from advancing funds to two borrowers. 63 F.3d at 980. The borrowers later sued the insured-bank for intentional interference with contract, alleging that the letters of estoppel contained false statements. *Id.* at 980–81. The Tenth Circuit held that the insurer had a duty to defend the

intentional interference claim because (a) the policy provided coverage for injuries arising out of "the publication of . . . other defamatory or disparaging material"; and (b) the intentional interference claim was predicated on the publication of false, disparaging statements. *Id.* Importantly, the Tenth Circuit also held that the insurer was required to indemnify the insured-bank for any portion of the settlement the insured-bank later reached with the borrowers that was attributable to the intentional interference claim. *Id.* at 981–82 (remanding to the district court for further development of the record on that issue). In other words, *Bankwest* addressed both the duty to defend *and* duty to indemnify. *Id.* The logic of *Bankwest* applies with equal force here and demonstrates why ACT has established as a matter of law that it is entitled to indemnity coverage for the portions of the settlement attributable to both the Lanham Act and intentional interference claims, subject to exclusions.

> C. *The Court Cannot Determine as a Matter of Law Whether the Policy Exclusions for Knowing Falsity Are Applicable.*

With ACT having satisfied its burden of establishing coverage for "personal and advertising injury" under the CGL Policy, the burden shifts to CIC to establish an exclusion. *See Farm Bureau Life Ins. Co.*, 780 N.W.2d at 742. CIC argues that two overlapping exclusions apply: one for "knowing violation of rights of another" and another for "material published with knowledge of falsity." Under these exclusions, there is no coverage for "'personal or advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury' . . . [and/or] arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."

It is well established that an exclusion for "knowing" falsity like the one at issue here does not automatically apply to claims for which something less than "knowledge" is sufficient to establish liability. For example, the exclusion does not necessarily apply to defamation claims because they can be established through evidence that a false statement was made with reckless disregard for the truth. *See Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 171–72 (N.Y. 2002) (holding that insurer had to duty to defend). Similarly, coverage may exist on a claim for commercial disparagement because it, too, can be established through recklessness. *See Dave's Detailing, Inc. v. Catlin Ins. Co., Inc.*, No. 1:11-cv-1585, 2013 WL 12290269, at *7 n.3 (S.D. Ind. Aug. 2, 2013). The same is true for Lanham Act false advertising

20

claims. *See DecisionOne Corp. v. ITT Hartford Ins. Grp.*, 942 F. Supp. 1038, 1043 (E.D. Pa. 1996). The principle underlying these cases applies with equal force here: Because the intentional interference and Lanham Act verdicts could have been based on something less than "knowing" conduct, WIN's success on those claims does not per se mean the knowing violation or falsity exclusions apply. Instead, further development of the record is necessary to determine whether ACT's conduct was "knowing" in the way contemplated by those exclusions.

The fact that WIN established the elements for an award of punitive damages does not change this conclusion, although it undoubtedly strengthens CIC's position. In the instruction giving rise to the punitive damage finding, Chief Judge McDonough informed the jury that "[p]unitive damages may be considered if, and only if, the claiming party has shown by clear and convincing evidence that the defending party has acted intentionally, recklessly, maliciously, or fraudulently." (*See* ECF 746, pp. 13–14, *ACT, Inc. v. Worldwide Interactive Network, et al.*, Case No. 3:18-cv-186 (E.D. Tenn. Nov. 8, 2022).) Chief Judge McDonough further explained:

> A person acts intentionally when it is the person's purpose or desire to do a wrongful act or to cause the result. A person acts recklessly when the person is aware of but consciously disregards a substantial and unjustifiable risk of injury or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under all the circumstances. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts -- acts fraudulently when (1) the person's -- the person intentionally either misrepresents an existing material fact or causes a false impression of an existing material fact to mislead or to obtain an unfair or undue advantage, and (2) another person suffers injury or loss because of reasonable reliance upon that representation.

(Id.) As phrased, the instruction allows punitive damages based on something less than "knowing" conduct. Thus, the adverse verdict against ACT does not per se mean the exclusions for knowing violations and/or knowing falsity apply. Instead, this is a disputed issue of fact.

For its part, ACT tries to short-circuit the fact-finding process by presenting evidence of internal communications between counsel and businesspeople in early-to-mid June 2018 as part of the drafting of the South Carolina Letters. To the extent ACT is asking the Court to conclude as a matter of law that ACT did not "knowingly" make false statements or violate WIN's rights, the Court declines to do so, for two reasons. First, the parties have not briefed the issue of whether and to what extent an insured may expand the record in an insurance coverage dispute beyond what the insured presented in the underlying litigation regarding its state of mind for purposes of policy

exclusions like the ones at issue here. <u>Second</u>, even if some level of expansion of the record is appropriate, the Court cannot conclude merely from the correspondence presented by ACT that the company did not "knowingly" make false statements about WIN's business or engage in a "knowing" violation of WIN's rights. Instead, further development of the record is required.

## IV.    CONCLUSION.

ACT's Motion for Partial Summary Judgment (ECF 41) is GRANTED IN PART and DENIED IN PART. ACT has established as a matter of law that it is entitled to defense coverage under the "personal and advertising injury" provision of the CGL Policy for defending WIN's counterclaims in the underlying litigation. It has further established as a matter of law that the same provision provides indemnity coverage for the portions of the WIN settlement attributable to WIN's Lanham Act and intentional interference claims, subject only to Policy exclusions. As to the exclusions, however, ACT has not established as a matter of law that its conduct did not constitute "knowing violation of rights of another" or "material published with knowledge of falsity." Accordingly, litigation must continue as to the applicability of those exclusions.

CIC's Motion for Partial Summary Judgment (ECF 54) is DENIED.

Two versions of this Order are being filed, both under seal. The first version is unredacted and will remain under seal. The second version shows (in purple highlighting) the redactions the Court intends to make to the Order when it is made available on the public docket. The second version will remain under seal only temporarily. Within seven (7) days of the date of this Order, the parties must file objections identifying: (a) any additional portions of the second version that they believe should be redacted when the document is made available on the public docket; and/or (b) any portions of the second version that are currently proposed for redaction that they believe should not be redacted when the document is made available on the public docket. If no objections are filed, the Court will make the second version available to the public in its current form (except with the purple highlighted language fully redacted). If objections are filed, the Court will review them and make the changes it deems appropriate before making the second version available to the public in redacted form. To assist the Court in this endeavor, the parties' objections should explain the basis for any proposed changes.

**IT IS SO ORDERED.**

Dated: May 20, 2026

_____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE